BANK OF THE UNITED STATES *v.* MACALESTER.

Where funds were deposited for a special purpose, with notice to the receiver; he cannot refuse to apply them to the object for which they were deposited, on the ground that a debt is due him by the deposltor.

The state of Illinois created two separate funds for internal improvements—the one for general purposes, the other for the construction of a particular canal. The canal was under the superintendence of the canal commissioners, and a loan was authorized and negotiated on bonds bearing interest, payable at A., B., and P. The funds of the canal commissioners were deposited with the Bank of the United States at P. An account was also opened in the name of the fund commissioner of Illinois with the same parties, which account was overdrawn. Held, that the Bank of the United States, having notice of the creation and issue of such bonds and of coupons, entitling the bearer to receive the interest to accrue thereon at the Bank of the United States, and receiving on deposit funds sufficient to pay such coupons under an agreement to pay them, could not refuse payment on the ground of a debt being due by the state on the fund commissioner's account.

Assumpsit against a depositor for the amount of an overdraft, is a waiver of the tort, and subject to the general right of set-off.

The holder of coupons, payable to bearer, may maintain an action thereon against the party bound to pay such coupons, or use them as a set-off against him, there being no proof that they were unlawfully obtained.

IN error from the District Court of Philadelphia.

*Jan.* 15 and 17. Assumpsit for money advanced and money had and received. Plea, set-off. It appeared the defendant kept a deposit account with plaintiffs, and on the 1st of September, 1841, overdrew his account $2,883.93; to recover which, this action was brought. To sustain his plea, defendant proved he was the holder of sixty-nine coupons of Illinois and Michigan canal stock, which were in the following form :—

ILLINOIS AND MICHIGAN CANAL STOCK.

Cashier of the Bank of the United States, pay the bearer in Philadelphia, or at your agency in New York, thirty dollars, on the first Monday of July, 1840, for six months' interest on bond No. 1180.     J. D. WHITESIDE,
*Treasurer State of Illinois.*

$30.   No. 1180.

It was proved by testimony, the admissibility of which was not decided by this court, that these coupons had been deposited by the holder with Macalester & Stebbins, as collateral security for a loan of $1,500. The defendant, who was a member of that firm, proved an authority from Stebbins to himself, to use them as a set-off to the present demand.

The defendant also gave in evidence an act of Congress granting certain lands to the state of Illinois, to be sold, and the pro-

ceeds applied exclusively to the construction of the Illinois and Michigan Canal. And also an act of the legislature of Illinois, creating a board of commissioners styled "The Board of Commissioners of the Illinois and Michigan Canal," and authorizing the governor to negotiate a loan and issue bonds bearing interest, payable in New York, Philadelphia, and Boston, to be called "Illinois and Michigan Canal Stock;" and the proceeds of the loan and other funds raised under the act were by the act exclusively devoted to the purposes of the canal, and pledged to the payment of the principal and interest of the bonds. He further proved that a deposit account had been opened with the plaintiffs, in the name of the "Illinois Canal Commissioners," in which there was a balance to the credit of the account, of $10,149. He also proved a demand made on plaintiffs to pay these coupons, and gave in evidence the correspondence between himself and the plaintiffs on this subject. In their cashier's letter, it was stated that the state of Illinois was indebted to the bank, and a further advance deemed inexpedient; that the late fund commissioners' account was overdrawn $28,803, and the securities would not produce $16,000; "if the whole of the indebtedness of the fund commissioners were paid to the bank, the credit to the canal fund commissioners would of course be subject to pay the *coupons* in question, but not otherwise."

It also appeared that by an act of the legislature a separate board of commissioners was created by the state of Illinois, styled the "Board of Fund Commissioners," who were authorized to negotiate a loan for the purpose of general internal improvements.

The plaintiffs, to rebut the right of set-off, proved that a deposit account had been opened with them in the name of "R. T. Barrett, Fund Commissioner of Illinois," and that this account had been overdrawn $28,933.

STROUD, J., instructed the jury: "If the Bank of the United States, knowing that the state of Illinois had created a stock called 'Illinois and Michigan Canal stock,' and had issued coupons authorizing payment to the bearer of the same of a sum of money therein specified, received funds from the state of Illinois sufficient to pay all such coupons, under an agreement to pay the bearer of the same; and if the defendant, being the bearer of the coupons in evidence, presented them to the bank on the 9th of July, 1841, and demanded payment thereof, and such payment was refused on the ground that the state of Illinois had become indebted to the bank by overdrawing on the credit of another fund derived from

the same state, under an agreement to apply it to the payment of a different species of state securities; the defendant is entitled to an allowance for the amount of the coupons in evidence so held and presented for payment.

"If the jury believe that the coupons were held by the defendant as collateral security for an advance made upon them to a third person, who was the owner of them when the advance was made, this would not deprive the defendant of the legal right to use them as a set-off."

The exceptions to the evidence were: in admitting the acts of Congress•and of the legislature in evidence—these were not on the record, but are stated in the opinion of this court—in admitting the coupons and the evidence of Stebbins, who proved the receipt of the coupons by himself as collateral security for a loan. The objection was, he was a partner of the plaintiff. The others are fully stated in the opinion of this court.

The charge of the court, and the refusal to charge that the act of the plaintiff was a wrongful act, from which he could not derive any advantage, were also assigned for error.

*Brooke* and *Rawle*, for the plaintiffs in error.—The existence of any trust, or the knowledge and assent of the bank to hold the moneys deposited for specific purposes, was denied, and was to be proved by defendant. All they knew was that the state, for certain reasons, had two deposit accounts, and was on the whole largely indebted to the bank. The defendant must show that the state could not control the two funds, or his right is gone. To do so he must show a deposit on a specific trust, and notice to the bank. For this purpose he read the act of Congress, which was irrelevant, if on no other ground, because it was on condition the canal should be commenced within five years. The acts of the legislature pledge certain funds to the distinct classes of improvements, but they are all derived from the same source. And had this not been so, there was no proof that the fund deposited was derived from a particular source. Could the bank refuse payment of a check on the ground of the money being trust funds? Certainly not, they could not look to that; but if, as contended, the money belonged to the holders of outstanding coupons, this would be the result. But clearly, there is no evidence of notice to the bank of the existence of these statutes.

The coupons were inadmissible, for there was no evidence of plaintiffs' title. Possession is not so, for they are not negotiable.

They are neither note, check, nor bill. They are mere certificates of interest belonging to the holder of the bond, and inseparable therefrom but by his act.

There is no authority given by the state to create such distinct evidences of debt : 13 East. 509 ; 7 Bing. 284. In these cases it was held that E. I. bonds, though passing from hand to hand as currency, are not negotiable, and so as to coupons, the jury finding they were not so by usage.

The act of the plaintiff was a stratagem which he cannot avail himself of. It was a tort for which an action would lie, and the mere form of action cannot benefit him.

Stebbins was incompetent as a partner in the transaction by which these coupons were obtained : his assignment to defendant did not divest his interest in the suit.

*Cadwalader* and *H. D. Gilpin*, contrà.—The form of the action waives all questions as to the tort. The questions argued here can scarcely be considered as proper for this court. The facts that the fund was appropriated to the coupons and the canal, and so known to the bank, are found by the jury, and the admission of our right by the cashier subject to the one question, is a sufficient answer to the argument here. That one question is the right of the bank to appropriate a special deposit to the payment of a general balance. They rested on this alone. To sustain it, would be to sustain a breach of faith, and to compel the state to commit a fraud. The acts of the legislature show that certain funds were appropriated to these bonds. It is admitted this deposit was made with those funds, and yet the bank claims the right to appropriate it to another purpose contrary to the will of the state. The effect of the coupon was to transfer the right to so much of the fund to the bearer. The means of thus transferring the right is the very object of a bill : Ferriere Dict. 259, b ; 10 Merl. Rep. 6 (b) ; 5 Merl. Quest. 25 (a. b.) ; Pardes, 332 ; 5 Wheat. 288 ; 3 T. R. 182 ; Story on Bills, § 13. Whether this was a legal or equitable transfer is immaterial, for the right of set-off is much broader under our act than the English statutes, and includes equitable, as well as legal claims : 1 Yeat. 574 ; 1 S. & R. 478 ; 2 Dall. 238 ; 1 Raw. 230 ; 12 S. & R. 445. 7 Bing. 284, was a case where there was an unlawful detention. Over this particular fund thus transferred, the bank had no right nor any lien, for it is well settled, that a fund received for a particular purpose cannot be applied to any other by the agent :

5 T. R. 492; 3 M. & S. 344; 15 Mass. 397; 1 J. C. R. 397; 1 Raw. 330; 16 Ves. 279.

*Jan.* 26. ROGERS, J.—Without stopping to inquire whether the defendant was strictly justifiable in resorting to a stratagem to obtain what he considered a legal advantage; or to determine whether the imputed injustice of the proceeding was a wrong to the teller rather than the bank, we are of opinion, that under the circumstances, there is nothing in the transaction which precludes the defendant, if otherwise entitled, to claim the benefit of a set-off. If there was a tort, the plaintiff has thought proper to waive it by bringing an action of assumpsit on the common counts, instead of an action for the deceit. That a party may elect to waive a tort, and sue in debt or assumpsit, is a proposition too well settled to be now questioned. When the plaintiff sues as in contract, the foundation of the action being in tort, the defendant is entitled to set-off; for although not entitled to such a defence when the action is for the tort, yet, when the form of the action is changed to contract, it is otherwise. For these principles, which are undisputed, I refer generally to the authorities cited.

To the set-off as claimed by the defendant, and to certain decisions of the court in the course of the trial, several objections are taken.

It is said the court erred in admitting in evidence the act of Congress of March 2d, 1827, and the acts of the legislature of Illinois, passed in January, 1836, entitled "An act for the construction of the Illinois and Michigan Canal," and the act of the same state, entitled, "An act to establish and maintain a general system of internal improvement," passed the 27th of February, 1827, with its supplement.

The acts referred to were offered for the purpose of showing the source from which the deposit in the Bank of the United States to the credit of the Illinois canal commissioners arose. For these purposes the acts were legitimate evidence. The Congress of the United States grants to the state of Illinois, to aid in making a canal to unite the Illinois river and Lake Michigan, a certain quantity of land therein described, the land to be subject to the disposal of the legislature of the state for these purposes and none other. Provided that the canal shall be commenced in five, and completed in twenty years, or that the state shall be bound to pay for land previously sold, and the title of purchasers under the state to be valid. As an objection to this part of the evidence, it is said, that

it does not appear the canal was commenced within five years, nor that it was completed within twenty years. But to this it is satisfactorily answered, that the contrary does not appear, and that we cannot assume that the grant was invalid for non-compliance with the terms and conditions of the act. But be this as it may, we cannot rule the evidence to be irrelevant, as it tends to show, in connexion with the acts of the state legislature, and the corresponding deposits made in bank, in which the funds are kept separate and distinct, their nature and origin. Although we do not consider the act of Congress, nor the acts of the legislature of the state, absolutely essential to the defence, yet they are not so irrelevant as to call for a reversal on that exception. After a trial on the merits, evidence ought to be clearly irrelevant, and of a nature to work injustice, before we can remit the cause for another hearing. Very considerable latitude must be given to the court that tries issues of fact, as to the order and materiality of evidence, otherwise injustice may be done by reversing a judgment for an error so immaterial as not to have the slightest effect on the verdict.

The act of June 9th, 1836, is admissible; for it in a more distinct manner not only shows the source from which the fund in the bank arose, but in other respects has a bearing on the matter of controversy. The governor is authorized to negotiate a loan on the credit of the state, of $500,000, to aid, in connexion with such other money as may hereafter (evidently relating to the act of Congress before noticed) be received from the government of the United States, in the construction of the Illinois and Michigan Canal. He is authorized to issue certificates of loan, to be called the Illinois and Michigan Canal Stock, signed by the auditor and countersigned by the treasurer, bearing interest at six per cent., payable semi-annually at the Bank of the State of Illinois, *or in New York, Philadelphia, or Boston; and the faith of the state is pledged for the payment of principal and interest.* The money loaned, premiums on sales of stock, proceeds of canal lands, town lots, and all other money arising from the contemplated canal, to constitute a canal fund to be used for canal purposes, and for no other whatever, until the canal is completed. The governor is authorized to appoint a board of canal commissioners, to be called " The Board of Commissioners of the Illinois and Michigan Canal." The board of canal commissioners is incorporated; and the revenue arising from the canal and from land granted, or that may be hereafter granted to the state of Illinois by the United States, for

the construction of the canal, and the nett tolls thereof, are pledged for the principal and interest of the stock.

The act of February 27th, 1837, to establish a general system of internal improvement, creates a Board of Fund Commissioners, with power to contract and negotiate all loans authorized on the faith and credit of the state for objects of internal improvement.

From the powers of the latter commissioners is carefully exempted the construction of the Illinois and Michigan Canal.

These acts clearly develope (and for this reason they are specially referred to) the policy of the state; and in conformity thereto, as the fund raised by the state for these different purposes came from different sources and are to be applied to different objects of internal improvement, they are kept separate, and are so deposited in the bank selected as the depository, in the city of Philadelphia. The state of Illinois opened two accounts with the Bank of the United States, one in the name of the Illinois canal commissioner, the other in the name of R. F. Barrett, fund commissioner of Illinois. The first, as is admitted by the cashier, intended for the Illinois and Michigan Canal, the other intended for the general improvement of the state. That the legislature had the right, and indeed that it was the duty of the officers appointed to superintend the two funds, to keep them separate and distinct, will not admit of doubt; and that the bank, who, the jury have found, knew of this policy, had the right and did accept the deposits on these terms, cannot well be denied. For when the coupons which form the subject of set-off were presented for payment, it was admitted by the cashier, and afterwards substantially by the directors of the bank, they were properly payable out of the money standing to the credit of the canal fund commissioners; and that there was money in their hands of that fund to an amount more than sufficient for their discharge. The only objection to the payment was, that the late fund commissioners' account was overdrawn to an amount more than enough to absorb the balance due on the fund deposited to the credit of the Illinois and Michigan Canal. After stating that the late fund commissioners' account was overdrawn $29,803.35, the securities held for which would not produce over $16,000, while the credit to the canal commissioner was only $10,149.23, the cashier says: "If the whole of the indebtedness of the fund commissioners was paid to the bank, the credit to the canal fund commissioners would of course be subject to pay the coupons in question, but not otherwise." The bank claims the right, through their accredited organ of communication, the cashier, after accepting the

deposit for a particular and special purpose, to divert the fund from that purpose without the assent of the state, on the pretext that they had suffered the state to overdraw the account opened for the general purposes and use of the state, and that as against a creditor to whom the fund was pledged.   It is not necessary to deny the power of the state, at their will and pleasure, to control both funds, although it cannot be doubted that said action would be a breach of the plighted faith of the state.   But that an agent, similarly situated as the bank, can do so without special authority, is a proposition difficult to maintain.   The overdraft by the state was on another fund.   The fund was left secure and untouched, and it was the folly of the bank to pay the drafts when they knew the state had no money deposited on that account to meet them.   The subsequent appropriation was an after-thought or means taken by them to make a set-off in part against the state.   It seems that neither Macalester nor the bank are very desirous of being the creditor of the state of Illinois; and hence the management of both parties to avoid, if possible, this position.   Whether the set-off would avail against the state, we give no opinion; but as against the defendant, who was the holder of the coupons, it is entirely inadmissible. As long as the deposit is permitted to remain in their hands, they are the agents of the holders of the coupons to the amount of the fund set apart for their payment.   It would be a culpable breach of trust to appropriate the fund to any other purpose, and especially to apply it to their own use.   The point is clear, on principle and authority.   Thus, in Taylor v. Plumer, 3 M. & S. 570, Lord Ellenborough held that the interests of the *cestui que trust* (and in this light we must view the holders of the coupons) shall not suffer by a change in the form of the fund, whether it was made in the performance of the trustee's duty, or in violation of it; because an abuse of the trust can neither give nor take away a right.   In Davis v. Bowsher, 5 T. R. 492, it is ruled, that bankers have a lien on securities in their hands, for a general balance of account; but Lord Kenyon takes care to except such securities as were delivered to him under a particular agreement.   In Cox v. Prentice, 3 M. & S. 344, the principle is asserted by Lord Ellenborough as clear and unquestionable, that an agent, who received money from his principal, is liable, as long as he stands in his original situation, and until there has been a change of circumstances by his having paid the money to his principal, or done something equivalent to it. Although the principles contained in the cases have a strong bearing on the question, yet I agree they are not so directly in point

as Jarvis *v.* Rogers, 15 Mass. 397; in which the doctrine is asserted that an agreement to hold a security for a specific purpose, deprives the holder of the right to apply it to a different one. Mr. Justice Wilde says:—If a debtor obtains of his creditors a loan of money on pledge, on the express agreement that the pledge shall be returned on repayment of the loan, the creditor cannot retain the pledge as a security for a prior debt, without violating the principle of good faith. Parties having a legal capacity to contract, have a right to make such stipulations as they see fit, provided they do not contravene the law; and such stipulations are to be faithfully observed by the contracting parties. So in Parkist *v.* Alexander, 1 J. C. R. 397, it is ruled, that an agent cannot avail himself of the advantage given by his agency, to apply it to his own benefit, to the injury of others. So in the Turnpike *v.* Watson, 1 R. 330, it is held, that the agent of a corporation who has received money for its use, cannot, in an action for money had and received, brought against him by the corporation, prove, by way of set-off, that he has paid the debts of the corporation, without showing a special authority. The principle clearly asserted is, that an agent cannot pay off any debt with a fund intrusted to him for another purpose. The legitimate inference to be drawn from the cases cited is, that the bank having received the money from the state for the special purpose of paying the principal and interest of the debt contracted or money loaned for constructing the Illinois and Michigan Canal, cannot divert it from its legitimate object, to the prejudice of the holders of coupons issued on the credit of the fund, by applying it to a general balance against the state. From this it follows, that by a refusal to pay, on the pretext of a set-off, a wrong was done to the defendant, for which an action lies to recover the value of the coupons.

Was there any error committed in the course of the trial? is the next question. The plaintiffs contend there was error in admitting the deposition of Henry C. Stebbins; in admitting in evidence the sixty-nine coupons; in permitting the defendant's counsel to propound a certain question to William Pleasants, a witness produced by the defendant; and in the charge.

As to the competency of the witness: As a set-off is in the nature of a cross action, it may be questionable whether Stebbins, who was a partner of Macalester, would be a competent witness on general principles, except for the purpose of showing that he assented to the set-off, as in Wrenshall *v.* Cook, 7 W. 464. But be this as it may, the witness was introduced to prove and did prove that

he, as one of the firm of Macalester & Stebbins, received the coupons as a security for a loan of fifteen hundred dollars, from a Mr. Tilson, who had been, but was not then the fund commissioner for the state of Illinois.    The testimony was introduced to show the title of the coupons to be in Macalester, who presented them for payment. But this testimony was unnecessary, because, the coupons being made payable to bearer, the possession was a sufficient title to demand and enforce payment.    The bank having refused to pay, the holder had a right of action by virtue of his legal title.    If the coupons had been surreptitiously acquired, this defence was open to the plaintiff; but until then he had, by virtue of being the holder, a *primâ facie* title to the property.    It cannot be pretended the agent stands in this respect in a better situation than the principal, and it would be a singular position for the state to take, in the face of their own issues agreeing to pay the amount to the bearer, that they could withhold payment until the holder traced his title from the original owner by proof which it would be in many cases impossible to obtain.    If a proposition so plain needed the aid of authority, it is to be found in the cases of Weston *v.* Baker, 12 John. 276; Crocker *v.* Whitney, 10 Mass. 319.    It was one, if not the principal object in issuing certificates of loan in this form, that they might pass from hand to hand by delivery without requiring a formal assignment.    Such has been the practice, and such was the understanding of the bank when they were presented for payment.    They made no objection that he was not the lawful owner or holder of the coupons, but they claimed the right of set-off as against the fund specially appropriated by the state.    It is true they may have been surreptitiously obtained, and if so, by proving that fact, it may be a good defence.    There are cases, as in Lang *v.* Smyth, 7 Bing. 284, where coupons are not regarded as money or negotiable instruments.    In that case the coupons referred to a certificate which gave the holder the option of converting his bonds into funded debt; the interest was paid to the holder of the coupons without production of the certificates, but the bonds were never sold in the market without the certificate.    Plaintiff kept the certificate in his own hands; but his agent, without authority, and fraudulently, pledged the bond to defendant, as a security for the debt.    The court left it to the jury to determine whether the instruments passed by delivery, or, in other words, were negotiable, and whether the defendants acted with due caution in receiving the coupons without requiring the certificate; the jury having found both questions in the negative, the court refused to set aside the verdict.    In Gorgier

*v.* Mieville and another, 3 B. & Cr. 45, however, a bond payable to bearer was held to be negotiable as exchequer-bills. That was the case of the King of Prussia, who gave bonds whereby he declared himself and his successors bound to every person who should, for the time being, be the holders of the bonds, for the payment of the prescribed interest in a certain manner : held, that the property in these instruments passed by delivery, as the property in bank-notes, exchequer-bills, or bills of exchange payable to bearer ; and that, consequently, an agent in whose hands such a bond was placed for a special purpose, might confer a good title by pledging it to a person who did not know that the party pledging it was not the owner. Here, the coupons contained an order to the cashier of the Bank of the United States, to pay to the bearer, in Philadelphia, or at their agency in New York, certain sums therein mentioned, being six months' interest on certain bonds specified. It would seem, therefore, from the case last cited, that they were negotiable, passing from hand to hand, as a note payable to bearer or a bill of exchange endorsed in blank. But whether negotiable or not, a point which we do not decide, yet it is very clear they pass the legal title to the instrument to whoever may be the holder, entitling him to demand and enforce payment by proof merely that he is the holder of the instrument. A promissory note or bill of exchange, after maturity, is not negotiable in its strict sense, yet a subsequent holder can bring suit in his own name as the holder alone. If this principle be sound, then the evidence of Stebbins may be stricken out entirely, and enough appears on the record to authorize the recovery. It also shows the propriety of admitting the coupons in evidence, which disposes of the third and fourth errors.

But it is urged that the court erred in permitting the defendant's counsel to propound to William Pleasant, a witness produced on behalf of the defendant, the question, "Was the Bank of the United States in a solvent condition at the date of the transaction in question, in the year 1842?" and permitting the witness to answer said question.

To this testimony the special objection was taken, that a witness was not capable of proving such a fact, as nobody could prove whether or not a bank was solvent. In some cases, perhaps, this may be true, but as a general proposition it cannot be maintained ; as there are some cases so glaring, that any person may prove it. When the fact of insolvency becomes material, it is surely not required that an account be taken of its credits and debits, before proof can be made of the insolvency of the institution. The ex-

ception, therefore, was not well taken. Whether he did prove it, was another and distinct question. Indeed, his testimony falls short of proving the absolute insolvency of the bank. " I have no knowledge," says the witness, " of the Bank of the United States redeeming their obligations in the summer or fall of 1841; their paper was at a discount; their notes were not redeemed as presented. I knew of their incapability to pay their engagements; I cannot say I knew them to be insolvent." The facts stated are such as any person was competent to prove. What may have been their effect was for the jury to decide.

From the remarks already made, it will be perceived that we see no error in the charge. For if the Bank of the United States (and the jury have so found), knowing that the state of Illinois had created a stock called the Illinois and Michigan Canal Stock, and had issued coupons authorizing payment to the bearer of the same of a sum of money therein specified, received funds from the state of Illinois sufficient to pay all such coupons, under the agreement to pay the bearer of the same; and if the defendant, being the bearer of the coupons in evidence, presented them to the bank on the 9th of July, 1841, and demanded payment thereof, and such payment was refused on the ground that the state of Illinois had become indebted to the bank by overdrawing on the credit of another fund derived from the same state, under an agreement to apply it to the payment of a different species of state securities; the defendant is entitled to an allowance for the amount of the coupons in evidence so held and presented for payment. If the jury should believe that the coupons were held by the defendant as collateral security for an advance made upon them to a third person, who was the owner of them when the advance was made, this would not deprive the defendant of the legal right to use them as a set-off. We see no reason for the objection of the plaintiff, that there was no evidence of the facts on which the charge is predicated; for there is proof which leaves not a doubt that the bank knew of the creation of the Illinois and Michigan Canal Stock, and that the fund was appropriated in fact for the coupon presented for payment, and that there was an engagement existing between them and the state to apply them to that purpose. Nor is there anything in the objection that they were held as collateral security. With the rights existing between the pledgor and the pledgee, they have nothing to do, nor is it of any consequence whether Macalester's right was as legal or equitable owner of the subject-matter of the set-off.

Judgment affirmed. '