# Eppinger, Executor, v. Allen et al., Trustees of Producers and Consumers Bank.

*Insolvency—Trust company—Receivers—Rights of depositors—Priorities —Tracing funds—Trust ex maleficio.*

1. The keeping open of the doors of a trust company or bank amounts to a representation of solvency, and the acceptance of deposits by an insolvent bank known by its officers to be such is a fraud upon the depositors.

2. In such case, the insolvent company stands in the position of a trustee *ex maleficio* as regards the deposits fraudulently obtained, and if the money can be traced it may be recovered.

3. Where a depositor of an insolvent bank or trust company claims to be a trust creditor, he must, in order to establish his right to a preference, trace the trust money into some specific property, fund, security or account of the insolvent which has passed into the hands of the receiver or assignee, and the proceeds of which are to be distributed.

4. A finding that a trust company was actually insolvent, and that its insolvency was known to its officers, will be sustained where the president testifies that six months before the receivership he was very much worried about a large and unsecured loan which was outstanding, that he was concerned about the "frozen condition" of the company's assets, that an audit made by a competent firm of accountants showed an excess of liabilities over assets amounting to a very large sum, and that receivership proceedings had been contemplated some time before they were actually instituted.

5. In case of banks or trust companies, where deposits are accepted when the company is known to be insolvent, and are commingled rightfully or wrongfully with the general funds, there can be no such identification or tracing of the trust funds as to entitle such depositors to a preference or priority. The rule is different from that applicable to individual trustees.

6. Where a trust company, known by its officers to be insolvent, receives, on the last day it does business, cash deposits and mingles them with moneys on hand, and makes withdrawals from this common fund on such day in excess of the amount of cash received on that day, the persons who made the cash deposits are not entitled to priority in distribution.

7. Where a trust company, known by its officers to be insolvent, accepts checks and other commercial paper for collection, and the collection is not made until after the appointment of a receiver, the owners of the notes and paper are entitled to the proceeds of the collection, inasmuch as the title to the paper remains in the owners until the proceeds are actually collected and received by the company.

8. In such case, the fact that credit was given in the pass-book for the amount of the paper does not change the situation.

9. The fact that a national bank, acting as collecting agent for the trust company, appropriates funds within its control to the payment of indebtedness due by the trust company, cannot affect the equities of customers of the trust company, where a fund has actually reached the receiver which, in equity, if not in fact, includes the moneys collected on their behalf.

10. Where money is given to an insolvent trust company for the specific purpose of transmission abroad, which purpose had not been accomplished at the date of the receivership, the customer is entitled to receive his money from the receiver.

11. Where money is deposited in a trust company known to be insolvent to secure the company in guaranteeing a contract, and there is no agreement that the money should be set aside for any particular fund, and it appears that the money was actually mingled with the general funds of the company, the customer is not entitled to a preference.

12. Where an insolvent trust company has sold travelers' checks issued by a banking association for such association, and the proceeds of such checks have been mingled with the funds of the company, the banking association has no right to a preference.

*Trust companies—Insolvency—Claims against company—Repairs to buildings.*

13. Where a trust company takes title to real estate as collateral security for a debt, and assumes control of the same by collecting rents and paying the employees of the building, a debt contracted by the superintendent of the buildings for repairs is a valid debt against the trust company.

VOL. 8—21

Eppinger, Executor, v. Allen et al., Trustees of Producers and Consumers Bank.

*Trust companies—Foreign drafts—Certified checks—Bond under the Act of June 19, 1911.*

14. Holders of foreign drafts, certified checks and treasurer's checks issued by an insolvent trust company are within the protection of the bond taken out by the company in pursuance of the Act of June 19, 1911, P. L. 1060.

*Set-off—Debts in the same right.*

15. One debt cannot be set off against another unless the debts are due in the same right or capacity.

Order disposing of exceptions to account, petitions for preferences and for return of deposits, and all disputed claims. C. P. No. 2, Phila. Co., March T., 1925, No. 12769.

*George J. Schorr*, for receiver; *Paul C. Wagner*, for A. Nash Co., Inc.

*Sidney E. Smith* and *Maxwell Pestcoe*, for various depositors.

LEWIS, J., Sept. 15, 1926.—This matter comes before the court on the first and also the final account of Albert M. Greenfield, receiver for the above-named defendants collectively, known as the "Producers and Consumers Bank." Numerous petitions and claims have been filed, which, if allowed, will necessitate changes in the accounts as filed. Several hearings were had upon the said petitions and claims, at which testimony was given on behalf of the claimants as well as on behalf of the receiver. On the basis of the testimony so produced, disposition is now made of all petitions and disputed claims as well as of exceptions to the receiver's account, as follows, the statement of facts given in connection with the various claims to be considered as the findings of fact of the court in regard thereto:

### Claims of depositors for priority.

*a.* Deposits made after 3 P. M., May 4, 1925.

The receiver was appointed and formally took possession of the bank after three and before four o'clock on May 4, 1925. The bank remained open and received deposits until that time. It appears that all deposits made after the end of the banking day of May 4th (3 P. M. marked the end) were deposited to the credit of the receiver in another bank in what was called a "segregated account." In other words, all depositors who made deposits between three o'clock and approximately ten minutes to four, when the bank closed, on May 4, 1925, are able to trace their deposits into a special fund in the hands of the receiver, and it is agreed on all sides that such depositors are entitled to a return in full of their funds so deposited.

*b.* Deposits made after twelve o'clock noon May 2, 1925, and before three o'clock May 4, 1925.

Certain of the depositors who made deposits during the hours specified under this heading have filed petitions praying the return in full of their deposits; others join the receiver in opposing such claims for preference. The petition filed by the A. Nash Company, Inc., is typical of the claims made, and we shall discuss it in particular in disposing of all of the claims in the same category.

The A. Nash Company, Inc., made a deposit of $2225.13 on Saturday, May 2, 1925, after twelve o'clock noon. The deposit consisted of $7 in currency, $68 in checks not drawn upon the depository bank, and $2150.93 in money orders. The deposit was dated May 4, 1925, and it appears that all deposits made between the hours specified were treated and considered as having been made on that date.

The Producers and Consumers Bank used the unit system, one teller acting as both receiving and paying teller. On Saturday, May 2nd, after 12 o'clock noon, deposits consisting of both currency and paper were received by the teller at the bank. During the same period the teller paid out of the mingled cash which he had on hand checks presented to him for payment, some of which were drawn upon the Producers and Consumers Bank and some upon other banks. When the bank closed at 10 o'clock in the evening, the remaining cash and the paper, including checks, money orders, etc., which had been received for deposit or cashed, were placed in the vaults of the bank and kept there over Sunday, May 3rd. The business of the bank was carried on in the same manner on Monday, May 4th, from the time the bank opened in the morning until 3 o'clock in the afternoon, when the banking day of May 4th ended.

## Discussion of the authorities.

The keeping open of a bank's doors amounts to a representation of solvency, and the acceptance of deposits by an insolvent bank, known by its officers to be such, is a fraud upon the depositors: Corn Exchange National Bank *v.* The Solicitors' Loan Co., 188 Pa. 330. Under such circumstances, the insolvent bank stands in the position of a trustee *ex maleficio* as regards the deposits fraudulently obtained, and *if the money can be traced*, it may be recovered. The italicized proviso is, as appears from our cases, the important factor in all claims for priority.

"Let it be assumed that the manner of doing business gave rise to a trust relation. The court below held that where a trust relationship exists, the mere fact that the trustee has mingled the funds received with other funds does not alter the relationship. That is true, but the court below went further and held that because the claim was founded in a trust, it was entitled to a preference in payment out of the general assets of the insolvent company. In this the court erred. A trust creditor is not entitled to preference over general creditors of the insolvent merely on the ground of the nature of his claim. To authorize such a preference, some specific recognized equity founded on the relation of the debt to the assets in the hands of the assignee or receiver, and which entitles the claimant, according to equitable principles, to a preference in payment out of those assets, must be established by evidence. The person claiming to be a trust creditor must, in order to establish his right to a preference, trace the trust money into some specific property, fund, security or account of the insolvent which has passed into the hands of the receiver or assignee, and the proceeds of which are to be distributed. He must identify the fund out of which he demands to be preferred in distribution either as the original trust property or as the product of it:" Lifter *v.* The Earle Co., 72 Pa. Superior Ct. 173. Or, as stated by the Supreme Court in Webb *v.* Newhall, 274 Pa. 135: "It is, however, not the fact of a trust relation that entitles plaintiff to priority, but his ability to trace and identify the fund as his property: Lifter *v.* The Earle Co., 72 Pa. Superior Ct. 173; 34 Cyc., 348. A trust creditor, merely as such, has no preference over others: Thompson's Appeal, 22 Pa. 16."

And in Lebanon Trust and Safe Deposit Bank's Assigned Estate, 166 Pa. 622: "The auditor found, and upon sufficient testimony, that when the money which composed the fund for which preference was claimed in this case was deposited in the bank, it was simply placed in the general funds of the bank. No investment of it was made in any securities of the bank, nor was it in any way separated or individuated from the general funds. It was not earmarked in any way, and it is not even alleged that the original money depos-

ited can possibly be traced or discovered. In such circumstances, the obligation of the bank became simply a debt of the bank, and entitled only to the same recognition in the distribution as other unsecured debts." . . .

To the same effect are Assigned Estate of Solicitors' Loan and Trust Co., 3 Pa. Superior Ct. 244; Com. ex rel. v. Union Surety and Guaranty Co., 37 Pa. Superior Ct. 167; another appeal in the same case, 37 Pa. Superior Ct. 179; Groff v. City Savings Fund and Trust Co., 46 Pa. Superior Ct. 423; Miller's Appeal, 218 Pa. 50.

It is admitted, therefore, that before the A. Nash Company and depositors making similar claims are entitled to priority for cash deposited by them, they must show (1) the insolvency of the bank at the time their deposits were made; (2) knowledge of such insolvency by the officers; the presence of these two facts establishes the trust relationship, but the right of priority depends on their ability to show (3) that their deposits can be traced.

The first prerequisite has been admitted, and the second, although denied, has been established to the satisfaction of the court. Keeping in mind that "it is not insolvency in its popular sense that the law regulating banks and trust companies and kindred corporations deals with, but insolvency in its legal sense, which exists whenever such an institution as this, from any cause, is unable to pay its debts in the ordinary or usual course of its business" (Com. ex rel. v. Tradesmen's Trust Co., 237 Pa. 316), we think the testimony justifies the finding which we make, that the officers had on May 2, 1925, actual knowledge of insolvency. One of the officers refused to testify. The president of the bank did submit to examination, however, and frankly admitted that as early as August or September of 1924 he was very much worried about a large and unsecured loan which was outstanding, that he was concerned about the "frozen condition" of the bank's assets, that an audit made by a competent firm of accountants showed an excess of liabilities over assets, amounting to more than $400,000, and, finally, that receivership proceedings had been contemplated before they were actually instituted on May 4, 1925.

### Tracing of cash.

The figures have been agreed upon. In support of the argument that depositors on May 4, 1925, can trace their money, counsel for the A. Nash Company, Inc., argues from the figures as follows: "There was deposited in the bank during the banking day of May 4th $31,234.04 in cash, which, under the rule stated above, was received by the bank as a trustee ex maleficio. It is a general rule and one which cannot be questioned, that whenever a recipient of trust funds mingles such funds with his own in a common fund and thereafter makes payment from the common fund, it will be presumed that all payments are made out of funds from which they may properly be made and that the trust fund is the last to be drawn upon. Accordingly, the balance of cash turned over to the receiver and deposited by him in the People's Bank and Trust Company, amounting to $18,792.44, must be considered to consist entirely of moneys deposited on May 4th. We are also able to trace, in addition, over $12,000 of money which came into the bank during this day. $6000 in cash was deposited in the Quaker City National Bank. An additional $6388.70 was paid out at the teller's window for checks which were cashed. These were checks which were not drawn upon the Producers and Consumers Bank and were deposited partially in the Quaker City National Bank and partially in the New York Trust Company. All of these checks were collected, and it is submitted that the proceeds of these checks must be impressed in any marshaling of assets with the trust imposed in favor of the depositors

whose money was used to pay such checks. Of this amount of $6388.70, $431.75 was collected through the New York Trust Company and the balance of $5956.95 was collected through the Quaker City National Bank. The sum of the three items which have just been discussed totals in excess of $31,000, and is within a few hundred dollars of the total amount of cash deposited in the bank on May 4th."

This, it is contended, is a sufficient tracing, as it is not necessary that the identical pieces of money be traced; the cases of Webb *v.* Newhall, 274 Pa. 135, and Conneautville Bank's Assigned Estate, 280 Pa. 545, are relied on in this connection. Counsel for the receiver and for some of the other depositors in this same class, who do not, however, claim any priority, take the position that these cases are not in point, for the reason that a bank or trust company was not involved in them. They properly call attention to the language used by the court in each of the cited cases as appearing to support the distinction they draw. Thus, in Webb *v.* Newhall, in which it was held that "where a broker sells stock of a customer and deposits the proceeds thereof in his own bank account and draws a check to his customer's order, and from the date of the deposit until his subsequent assignment for creditors has at all times a balance more than sufficient to pay the check, the customer is entitled to the payment of the check" in full, although not presented until after the assignment, Mr. Justice Walling said: ". . . Here the relation between plaintiff and the brokers was that of principal and agent, not of debtor and creditor, and so long as his money remained in their bank account he could reclaim it. Had they used it for their own purposes and placed other funds in the account, an entirely different case would be presented, *as there would had the agent been a banking institution and mingled the funds with those of others in the general course of business:* Com. ex rel. *v.* Tradesmen's Trust Co. (No. 2), 250 Pa. 378; Miller's Appeal, 218 Pa. 50; Bank's Assigned Estate, 166 Pa. 622."

Mr. Justice Schaffer, in the Conneautville Bank's Assigned Estate case, likewise distinguished from the case presented to him cases "where money was received by a bank as trustee, which trust money the bank had put in its general funds in the usual course of business," saying: "In such cases, we have held that no one *cestui que trust* is entitled to a preference, since he is unable to trace his money. In some of these decisions the rule is laid down that, where the trustee is a bank, the fact that an amount equal to, or greater than, the amount of the fund claimed was at all times on deposit does not give the *cestui que trust* the right to a preference, even though such is the rule established by English and other cases as to an individual trustee."

The case, however, which conclusively answers the contention of those claiming priority as to their cash deposits is Com. ex rel. *v.* Tradesmen's Trust Co. (No. 2), 250 Pa. 378. In that case an insolvent, for the purpose of protecting his creditors and avoiding the expenses incident to bankruptcy proceedings, entered into an agreement with his creditors and with the Tradesmen's Trust Company, whereby he executed a mortgage and bill of sale of all his property to the trust company, as trustee, for the purpose of converting such property into cash and holding and distributing the proceeds for the benefit of all his creditors. The property was converted into cash and an account was given by the trust company showing a certain balance in its hands, but before distribution was made the company closed its doors and a receiver was appointed. The trustee for the insolvent put in a preferred claim. The auditors appointed by the court found that the fund was a trust fund, that there was at all times a balance on deposit in the account in which

this fund was entered of more than the amount thereof, but that the fund was mingled with the general funds of the trust company. It was held that the claimant was not entitled to priority, and the Supreme Court affirmed the decision. The court, in its opinion, refers to the English and American cases cited by the claimant, which "establish the general rule that where a trustee receives money from a *cestui que trust* and deposits it with his own account and in his own name, to which account he subsequently adds and withdraws money, the *cestui que trust* may claim to the extent of his trust fund the lowest amount which was on deposit at any time during the continuance of the trust, regardless of the fact that the funds were commingled and increased or diminished from time to time. This rule is based on the theory that the trustee will not be presumed to have intended to commit a criminal act, and so long as there are funds of his own, though mixed with the trust funds, any withdrawal from the account will be considered as a withdrawal of his own money, and not that belonging to the trust, and it is only when the total amount is reduced below the amount of the trust that this presumption is rebutted, because the circumstances preclude any other possibility. There appears to be no case in Pennsylvania where it has been decided by an appellate court that the above rule is the law of this State, nor is it necessary to decide here the precise question as to whether the rule should be applied in cases where the trustee is an individual and deposits money in his own bank account." The ground of the decision is then stated: "The trustee here is a trust company authorized by statute to receive and handle funds of others and do a general banking business. In the conduct of this business it necessarily handled trust funds belonging to a large number of persons. These funds in the present case were deposited in a general account, and in this way it became impossible to say to whom any particular part belonged. The case is distinguishable from that of an individual trustee who mixes the funds of a single *cestui que trust* with his own account. In such case it can readily be determined whether, and to what extent, he has appropriated the trust fund to his own use. On the other hand, when a trust company deposits in a common account funds belonging to various persons, it cannot be said that the mere fact of there being on deposit at all times sufficient to meet the claim of any particular customer of the bank entitled that customer to claim it as against other claimants whose money also went into the same account. Claimant could not trace title to any particular part of the deposits, and his claim can, therefore, rise no higher than the claim of others whose money was deposited in the same general fund."

With the contention that the claim for priority in the cited case was refused solely for the reason that "the creditor claiming the preference did not show his fund was the only trust fund deposited in the account out of which he claimed," we do not agree. The distinction is drawn between individual trustees and trust companies, and it forms the basis of the decision. In the case of trust companies, we take it to be the law of Pennsylvania that when trust funds are commingled, rightfully or wrongfully, with the general funds, there can be no such identification or tracing of the trust funds as to entitle the owner to a preference or priority. In Miller's Appeal, 218 Pa. 50, a receiver deposited moneys of the estate in a trust company which was surety upon his bond. There was a rule of court that required such sureties to keep moneys deposited with them in a separate and earmarked account. It appears, however, that the money deposited by the receiver was not so kept, but was mingled with the general funds of the company, the arrangement being that the receiver should receive interest on the fund and could also draw checks

thereon. Upon the trust company's becoming insolvent, the receiver filed a petition to be paid in full. The petition was dismissed. In the course of his opinion affirming the order of the lower court, Mr. Justice Fell said: "If the rule of court applies to a deposit of this character, it was not observed, and no trust relation was established. If it had been established, the appellant would not have been entitled to a preference. His money was mingled in a deposit of $619,000, over $20,000 of which was deposited by other persons for whom the company was surety."

A proper case of tracing funds in a bank was presented in Corn Exchange National Bank v. Solicitors' Loan and Trust Co., 188 Pa. 330. There the plaintiff bank, upon request of the defendant bank, sent to it $2000 in two-dollar bills and received the latter's check for that amount. The next day the defendant bank failed. The check was not paid. The $2000 in bills received by the defendant bank remained in the package in its possession unbroken, and was turned over to the assignee who took charge. The court directed the assignee to return the $2000 in bills to the plaintiff bank. Another illustration of a proper tracing of funds in the case of banks is the case of Washington Shoe Manuf. Co. v. Duke, 218 Pac. Repr. 232 (Wash.), where all deposits made on the day before the suspension of business by the bank were placed in separate envelopes bearing the name of the particular depositor.

We have a quite different set of facts here. The testimony shows that at noon on May 2nd, the Producers and Consumers Bank had cash on hand in the sum of $20,224.70. When the receiver took charge on May 4th he found on hand cash in the sum of $18,792.44, or approximately $2000 less than the amount on hand at noon on May 2nd. There had been cash deposits made between May 2nd at noon and May 4th until 3 P. M. totaling about $31,234.04. In addition, there were certain other items, such as foreign exchange and treasurers' checks, which brought the total cash received by the bank during the above period to $31,832.99. During the same time cash was withdrawn (all from the same box) to the extent of about $31,000 up until 3 o'clock of May 4th, and the further sum of $2300 between 3 and 4 o'clock on May 4th. Of the sum so withdrawn, the sum of $6000 in cash was deposited at the Quaker City National Bank.

So far as the cash is concerned, we, therefore, have a case in which a bank receiving cash deposits mingled them with moneys on hand and made withdrawals from this common fund on the last day of business in excess of the amount of cash received on that day. The cash found by the receivers is before the court for distribution, and to entitle any depositor to priority he must be able to identify his money. He clearly cannot do so.

Hence, all petitions for the return of cash deposits made before 3 P. M. on May 4, 1925, or for a preference or priority as to such deposits, are dismissed.

The records of the bank as to the time when deposits were made are adopted by the court as showing the actual time of deposit, no sufficient evidence of inaccuracy having been presented by any claimant.

*Claims as to paper deposited for collection.*

All papers deposited with the Producers and Consumers Bank and cashed over its counters (except checks drawn upon it) during the banking day of May 4th were placed in the usual course for collection. All items drawn upon New York banks were mailed to the New York Trust Company in New York. All other items, in which were included all money orders, regardless of the post-office upon which they were drawn, were deposited from time to time

during the actual day of May 4th with the Quaker City National Bank, which bank acted as collection agent for the Producers and Consumers Bank. When the Producers and Consumers Bank made a deposit in the Quaker City National Bank, credit for the amount of the deposit was given to the Producers and Consumers Bank in its pass-book, although there was a provision in the pass-book that "all checks, drafts, notes, acceptances and other items deposited as cash, or for credit, . . . are received and forwarded for collection only at the depositor's risk."

Such items, after deposit in the Quaker City National Bank, were collected by that bank in accordance with its general custom, which was as follows: All items drawn upon banks which were members of the Philadelphia Clearing House Association were presented for payment and paid through the Clearing House on the following day, May 5th; all other items were forwarded by the Quaker City National Bank to the Federal Reserve Bank of Philadelphia for collection and were collected by the latter bank on May 5th, or thereafter. The above customary procedure applies to all such items with the possible exception that certain items of more than $500 may have been collected directly by the Quaker City National Bank during the day of May 4th, although there is no evidence to show that this was actually done in the case of any particular item deposited.

It is admitted that all of the items deposited during the day of May 4th by the Producers and Consumers Bank with the Quaker City National Bank (with the possible exception of any such items over $500, referred to above) were on the night of Monday, May 4th, either in the vaults of the Quaker City National Bank or in the vaults of the Federal Reserve Bank and were actually paid on May 5th or at some later date, and that all items which had been forwarded to the New York Trust Company in New York for collection during the day of May 4th were either in transit or in the vaults of the New York Trust Company on the night of Monday, May 4th.

During the banking day of May 4th, paper in the amount of $43,150.32 was deposited in the bank. Of this, $37,786.31 was deposited in the Quaker City National Bank, but of this amount $20,031.29 was subsequently returned unpaid: $1346.16 was forwarded to the New York Trust Company for collection, of which $299.99 was returned unpaid; one item drawn upon the Franklin Trust Company, amounting to $35, was sent direct to the Franklin Trust Company and later returned unpaid; $3982.85 represented checks drawn upon the Producers and Consumers Bank by other customers, and of this amount, $3100 was returned to the respective depositors unpaid, because of the failure of the bank. The net result is that of the $43,150.32 in paper which was deposited, only $19,683.05 was actually collected, of which $17,-755.02 was collected through the Quaker City National Bank and $1046.17 was collected through the New York Trust Company.

It is admitted that the checks and money orders deposited by the A. Nash Company were collected subsequent to May 4th. The receiver contends that the petition for a return of these amounts should be dismissed because, as in the case of the cash deposits, there has been no tracing or identification of the funds collected. Much effort has been expended in the briefs to show that they can and cannot be traced, but our view of the law is that such a consideration is beside the point. In Freiberg v. Stoddard, 161 Pa. 259, and Com. ex rel. v. Bank of Pittsburgh, 216 Pa. 124, in which the court rejected claims for priority as to collected moneys on the ground that the claimants had not traced the trust money into "some specific property or into some particular fund," it appeared that the collections had been made prior to insolvency. See

24 Am. Law Reps. 1152, and In re Gubelman, 10 Fed. Repr. (2nd) 926, which points out clearly the difference in the two situations. Those cases also differ materially from the instant one, in that the assets of the bank were not in the cited cases increased one dollar by virtue of the collections, as the drafts deposited for collection were drawn upon depositors, whose accounts were then charged therewith. Counsel admit they have been unable to find any Pennsylvania case directly in point, and our own research has not unearthed any, but, on principle and on the authority of numerous cases from other jurisdictions, we are convinced the petitions must be granted as to paper deposited before, but not collected until after, the appointment of a receiver.

Passing by the proposition that accepting checks when the bank was known to be insolvent was a fraud on the depositors, so that title to the paper never passed from them (Richardson v. Denegre, 93 Fed. Repr. 572; Selover, Bank Collections, § 12), it is clear that the checks and other commercial paper deposited with the bank were received by it as agent for collection. It was specifically so stated in the contract between the bank and its depositors as contained in the pass-books "The Producers and Consumers Bank acts only as collection agent," and there is no evidence before us of any special agreements to the contrary. It is well settled under the authorities that in such cases title to the paper remains in the depositors until the proceeds are actually collected and received by the bank. The fact that credit was given in the pass-book for the deposits does not, of course, under the law of Pennsylvania, change the situation: Bank of Wesleyville v. Rose, 85 Pa. Superior Ct. 52; Hazlett v. Commercial Bank, 132 Pa. 118; National Bank of Phœnixville v. Bonsor, 38 Pa. Superior Ct. 275. Though it does not appear that the checks and money orders were expressly endorsed "for collection," in which case it is clear the title would remain in the depositors (First Nat. Bank v. Gregg, 79 Pa. 384; Rapp v. Nat. Security Bank, 136 Pa. 426), title did not pass to the bank in view of the contract that all paper was received for collection only (see 11 Am. Law Reps. 1043); the form of the endorsement, in view of the contract, is immaterial: Hackett v. Reynolds, 114 Pa. 328.

By the same contract the bank had the right to "charge back" uncollected paper; this, according to the majority view, is another indication that title did not pass to the bank: Brady, The Law of Bank Checks (1915), § 216; 11 Am. Law Reps. 1050.

When a bank, which becomes insolvent or which makes an assignment for the benefit of creditors or goes into the hands of a receiver, has at that time uncollected paper on hand, its authority to collect is thereby terminated and the depositor is entitled to a return of the paper; if, instead, it is actually collected, the depositor is entitled to a return of the proceeds: Brady, The Law of Bank Checks (1915), § 214; Selover, Bank Collections (1901), § 32; 2 Michie, Banks and Banking (1913), § 166. Numerous cases are to be found in 2 Paton's Digest (1926), § 1598a. In 1 Morse on Banks and Banking (5th ed.), § 249a, the rule is stated: "After a bank has suspended, it ought not to receive payments upon business paper previously deposited with it for collection; or at least not in such a manner that the money so received by it will pass into its general assets, and the owner of the paper will be placed in the position of one of its creditors, entitled only to take his dividend. . . . Proceeds received after the bank becomes insolvent are held in trust and may be recovered in full."

Such is the rule of the Federal courts. See Beal v. Somerville, 50 Fed. Repr. 647 (C. C. A., 1st Cir.) ; Richardson v. Denegre, 93 Fed. Repr. 572

Eppinger, Executor, *v.* Allen et al., Trustees of Producers and Consumers Bank.

(C. C. A., 5th Cir.); Richardson *v.* New Orleans Coffee Co., 102 Fed. Repr. 785 (C. C. A., 5th Cir.); In re Jarmulowsky, 249 Fed. Repr. 319 (C. C. A., 2nd Cir.); In re Gubelman, 10 Fed. Repr. (2nd) 926 (C. C. A., 2nd Cir.), also 10 Fed. Repr. (2nd) 935.

The conclusion we have reached is not affected in the slightest by the adjustment of accounts which took place between the Producers and Consumers Bank and the Quaker City National Bank. The former had to its credit with the latter, as of noon May 2, 1925 (after deducting certain items subsequently returned unpaid), the sum of $16,829.34. On May 4th there was deposited by the Producers and Consumers Bank in the Quaker City National Bank $6000 in cash, $37,786.31 in paper, representing items deposited by depositors in the Producers and Consumers Bank (of which $20,031.29 was subsequently returned unpaid, as explained above), $6956.95 representing checks upon banks other than the Producers and Consumers Bank which were cashed at the teller's window and other unidentified items amounting to $267.58. The result of these deposits was that, after deducting the items returned unpaid, the net deposits on May 4th were $29,979.83, which, with the balance on hand at the beginning of the day, made a total of $46,809.17. During the day checks drawn by the Producers and Consumers Bank upon this account were paid amounting to $3297.93, leaving a net balance of $43,511.24, which, but for the facts stated hereafter, would have been subject to withdrawal by the receiver.

At the time the bank failed on May 4th the Producers and Consumers Bank was indebted to the Quaker City National Bank upon a note in the sum of $59,426. Interest was also due amounting to $344.96, making a total indebtedness of $59,770.96. As security for this indebtedness, the Quaker City National Bank held numerous promissory notes of customers of the Producers and Consumers Bank which had been discounted by that bank, the face amount of which totaled over $95,000.

The Quaker City National Bank had an agreement with the Producers and Consumers Bank applying to indebtedness or liability of the latter to the former bank, and under this agreement the Quaker City National Bank claimed the right to appropriate the balance standing to the credit of the Producers and Consumers Bank in its general deposit account in payment of the note. The Quaker City National Bank, after the receiver had been appointed, collected on the collateral in its possession $19,166.31. This left a balance due on the note of $40,604.65, which was paid out of the general deposit account of the Producers and Consumers Bank, the balance, amounting to $2906.59, being subsequently withdrawn by the receiver and forming part of the assets in the hands of the receiver.

After the above collections, amounting to slightly over $19,000, had been made by the Quaker City National Bank and its entire indebtedness liquidated by these collections and the appropriation of part of the deposit account, the Quaker City National Bank returned to the receiver the balance of the collateral which it held. This balance of collateral turned over to the receiver consisted of notes aggregating over $78,000, upon which the receiver has collected in cash over $43,000.

The action of the Quaker City National Bank in appropriating one of two funds within its control to the payment of its indebtedness cannot affect the equities of customers of the Producers and Consumers Bank when a fund has actually reached the receiver, which, in equity, if not in fact, includes the moneys collected on their behalf.

It is our opinion, and we so decree, that the claimants are entitled to a return in full of the proceeds of all checks and money orders deposited by them that were collected after the appointment of the receiver. As to all such items actually collected by the bank before the receivership, and the proceeds of which became a part of the general funds of the institution, payment in full is denied, the petitions therefor being hereby dismissed.

Of course, overdrafts and other obligations owing to the bank by all depositors herein held to be entitled to preference may be set-off against the awards to such depositors.

### Claim of Louis E. Stern.

This is closely akin to the claims arising out of checks deposited for collection. The claimant, on May 2, 1925, gave to the bank his check for $105.50, drawn upon the Equitable Trust Company of Atlantic City, for the purpose of having $100 thereof transmitted to Russia, and the remaining $5.50 to be retained by the bank as its commission. The check was marked upon its face that it was for money to be forwarded to Russia. The check was endorsed by the Producers and Consumers Bank on May 2, 1925, delivered to the Quaker City National Bank, which endorsed it on May 4, 1925, and it was presented to the Marine Trust Company of Atlantic City, New Jersey, on May 5, 1925, and on that date the check was paid by the Equitable Trust Company. The Producers and Consumers Bank did not transmit the funds.

Under these facts, we are of the opinion that the claimant is entitled to the return of his money, for two reasons: First, that the check was collected after the appointment of the receiver; and, secondly, that the money was given to the bank for a specific purpose, in which latter circumstance title to the fund did not pass to the bank, which held it merely as the depositor's agent for the purpose of transmission. This fiduciary relation of the bank in respect to the money is in the nature of a trust, and continues until the money is sent in conformity with the given directions. In addition to the authorities cited above, the following are in point in sustaining this claim: First National Bank of Shreveport *v.* State Bank of Portland, 110 Ore. 601, 222 Pac. Repr. 1079; Legniti *v.* Bank, 230 N. Y. 415, 130 N. E. Repr. 597; 7 Corpus Juris, 631, *et seq.;* Bank of United States *v.* Macalester, 9 Pa. 475.

### Claim of E. J. Reefer.

On July 24, 1922, the claimant, who traded under the name of Domino House in the sale of cosmetics, deposited with the bank $10,000 worth of bonds under a special agreement, whereby the bank was to guarantee to the customers of Domino House that the latter would live up to its agreement with them. The bonds were to be held by the bank to protect it against claims under the guaranty, and were to be returned within thirty days after the discontinuance of the agreement. On Feb. 10, 1925, the claimant authorized the bank to sell the bonds and to hold the proceeds of the sale as its protection under the guaranty. This was done, and the bank held the money, issuing to the claimant a certificate of deposit which recited that the claimant had deposited the money with the bank, that it was payable to his order upon return of the certificate properly endorsed, together with interest at the rate of 3 per cent. per annum; that thirty days' notice should be given for the withdrawal of the deposit; that the certificate was payable six months after discontinuance of the guaranty, and that the fund was not subject to withdrawal by check. No attempt was made by the claimant to show that the money was set aside in any particular fund; on the contrary, it appeared

that the money was mingled with the general funds of the bank. Under these circumstances and under the authorities heretofore cited, the claimant is not entitled to any preference or priority.

In addition to Miller's Appeal, 218 Pa. 50, the case of Com. ex rel. v. Union Surety and Guaranty Co., 37 Pa. Superior Ct. 167, is particularly in point. There the claimants for priority produced evidence that they had paid into the insolvent trust company a fund to be by it held in trust to guarantee the payment of coupons maturing on certain bonds. As in this case, however, no attempt was made to trace the fund and show that it, or anything which had been substituted for it, was the whole or any part of any property or assets which had passed to the receiver. The testimony was to the effect that the fund had been mingled with general funds. The claim was dismissed.

Similarly, in Com. ex rel. v. Tradesmen's Trust Co. (No. 3), 250 Pa. 383, the Hill School sent $5000 to the insolvent trust company for the purpose of repurchasing certain bonds which had been issued by the school. It was not so used; interest was given on the fund, which, according to the testimony, went into and became a part of the general funds in the nature of a suspense account. It was found to be a trust fund, but preference was refused because it could not be followed. It was further found by the auditors and lower court not to be a deposit, but merely a fund in the hand of the bank as agent. The school was held to be entitled to claim as a creditor only and not as a depositor.

There is no intimation that this deposit was to be kept in a separate fund. Indeed, everything points to the contrary. Interest was payable on the fund, and interest is paid by a bank for the use of money. Moreover, thirty days' notice was required for the withdrawal of the fund, which is more consonant with a use of the money by the bank than with a segregation of it. True, the fund was not to be subject to withdrawal by check, but this simply indicates that it was not an ordinary deposit: Com. ex rel. v. Tradesmen's Trust Co. (No. 3), 250 Pa. 383.

The claimant is entitled to share in the distribution as a general creditor only.

### Claim of Bankers Trust Company.

Part of the claimant's business is the issuing of American Bankers' Association travelers' cheques for various sums of money, whereby the claimant company agrees to pay to the purchaser or holder the face amount of the cheques upon presentation and proper endorsement. These cheques are commonly placed in the hands of various banks under agreements providing that immediately upon the sale of such cheques the proceeds thereof shall be remitted by the bank to the Bankers Trust Company to meet the payment of the cheques upon presentation. Certain of these cheques were sent to the Producers and Consumers Bank, and on May 2, 1925, the bank sold $800 worth to Louis De Santis, who was a depositor in the Producers and Consumers Bank, and whose account was charged with the amount of the purchase. The bank issued a draft to the order of the Bankers Trust Company in the sum of $800, which was never paid.

The cases involving individual trustees are relied upon, but, as has already been pointed out, they are not apposite. Granted that, although no money came into the bank as a result of the sale of the cheques, it became a trustee for the claimant to the extent of $800, the claim is entitled to no priority, in view of the fact that it cannot be traced. Whatever the rule may be in other jurisdictions, the law of Pennsylvania requires that the fund be identified in the hands of the receiver before it can be recovered. The petition is dismissed.

Eppinger, Executor, *v.* Allen et al., Trustees of Producers and Consumers Bank.

MISCELLANEOUS CLAIMS PRESENTED AND OBJECTED TO BY THE RECEIVER.

*Claims for repairs and supplies to 505 Chestnut St. and to Franklin Building.*

The Carlisle Realty Company was indebted to the bank in a large amount. As collateral security for the obligation, title to two buildings, 505 Chestnut Street and 133 South 12th Street, known as the Franklin Building, on June 19, 1924, was put in the name of F. Tyson Kinsell, who was president of the Producers and Consumers Bank. Thereafter certain supplies and repairs, admittedly proper and necessary, were ordered by the superintendent of the building. The question is now presented as to the bank's liability.

Whose agent was the superintendent? This is the only question, for the doctrine of estoppel is not involved, since, in most instances, the claimants did not know title to the buildings was in the bank. The testimony before us is to the effect that the bank collected all the rents and paid the carrying charges, including the salaries of employees of the building, supplies for the maintenance of the building, repairs and other similar items. During the period that this arrangement was in effect, the carrying charges exceeded the total amount of rents collected.

The claims should be allowed. The bank did more than simply take the titles as security. It entered into control and possession of the buildings, at least to the extent of collecting rents and paying bills with its checks. It paid the employees, and we have no doubt that if it had wanted to cut down the working staff it could have done so. It was at least in part control of the buildings, received all the benefits and many times recognized as its own and considered itself bound by the acts of the superintendents of the buildings by paying bills incurred by them. The last-mentioned fact is material in establishing the agency relationship: 1 Mechem on Agency (2nd ed.), § 263.

Claimants in this class were bound to prove the agency (Mahoning Valley Bread Co. *v.* B. & O. R. R. Co., 83 Pa. Superior Ct. 379), and we think they met the burden and established that the bank was in active control of the buildings and had control of the superintendent. This is the test of the bank's liability (Eckert *v.* Merchants Shipbuilding Corp., 280 Pa. 340); there is no testimony to the contrary.

The account should be amended so as to include claims of this class which were proved at the hearings held before the court, and those items incurred since the date of the receivership should be listed and paid as preferred claims.

*Claim of receiver of Adelphia Sales Company.*

At the time of the appointment of a receiver for Adelphia Sales Company, the latter was indebted to the bank on several notes. The receiver opened a bank account with the Producers and Consumers Bank and when the receiver was appointed for the bank, he appropriated the balance of $700.55 standing to the credit of the receiver of the Adelphia Sales Company in part satisfaction of a note which he found signed by the depositor receiver. The latter is now seeking to be included as a depositor in the bank to the extent of the balance appropriated.

In support of his claim, the receiver of the sales company testified that when the notes of the corporation fell due, the then treasurer of the bank requested him to renew them so that the notes would not have to be put in the past-due files; the matter was discussed at some length, the receiver informing the treasurer that the renewal note could not be made the obligation of the receiver, and it was finally decided that, since the president of the sales company had been removed from office by the appointment of a receiver and

could not, therefore, sign papers for the company, the renewal notes should be signed by the receiver. It was so signed, but the receiver received no new consideration at all.

In view of this testimony, which stands uncontradicted, the claim must be permitted. It is a principle of the law of set-off that the debts must be due in the same right or capacity. Here the bank attempted to set-off a debt which it owed the receiver against a debt of the corporation for which the receiver was appointed. This cannot be done. Obviously the effect of permitting such procedure would be to allow a general creditor of the Adelphia Sales Company to secure priority even to administration creditors.

The receiver of Adelphia Sales Company should be listed as a depositor to the extent of the balance standing to his credit before the appropriation.

· · · · · · · · · · · · · · · ·

### Claims against depositor's bond.

Holders of foreign drafts are clearly within the protection of the bond taken out by the bank in pursuance of the Act of June 19, 1911, P. L. 1060. It is our opinion that holders of certified checks and holders of treasurer's checks issued for withdrawals from deposit accounts or purchased for cash should also be considered as depositors within the language of the bond. It is accordingly ordered that the account list such holders as depositors, with the special advantages accruing to them as a result of the execution of the bond.

### Claims not presented.

All claims not presented at the audit, and any claims presented other than by petition and not otherwise disposed of at the audit or herein, are hereby disallowed.

### Order.

And now, Sept. 15, 1926, it appearing that Rule 79 of the Equity Practice has been complied with, the first and final accounts of Albert M. Greenfield are confirmed with the changes set forth in the foregoing opinion; all exceptions thereto not sustained herein are hereby dismissed, and all petitions other than those specifically sustained in the above opinion are dismissed. Counsel for the receiver will prepare a schedule of distribution in harmony with this adjudication and the account, provided, however, that all awards to depositors and other creditors shall be subject to any further rights of set-off which the receiver may have against them, and shall be subject also to any attachments and assignments which have been duly served upon the receiver.